UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JASON BRADFORD,<br><br>Defendant. | Case No. 1:17-cr-00067-BLW<br><br>MEMORANDUM DECISION AND ORDER |

# I
# INTRODUCTION

At around 4:30 in the morning on January 26, 2017, Jason Bradford was pulled over for failing to maintain his lane. During the traffic stop, a K9 officer arrived, asked Mr. Bradford to step out of the car, conducted a patdown, and discovered a gun in Mr. Bradford's jacket pocket. Mr. Bradford moves to suppress this evidence, arguing that the officers violated his Fourth Amendment rights by unlawfully prolonging the traffic stop and patting him down. *See* Dkt. 17.

The Court heard testimony at an evidentiary hearing on September 28, 2017 and the parties submitted supplemental briefing afterward. For the reasons explained below, the Court intends to deny the motion, but will refrain from ruling at this point.

# II
# FACTUAL BACKGROUND

In the early morning hours of January 26, 2017, several Boise Police Department officers, including Officers Mitch Tiner and Jason Green, were surveilling a suspected drug-trafficking residence in Boise. At around 4:00 a.m., Officer Green saw a Ford Bronco pull up to the house and park on the street. The driver went inside for between 15 and 40 minutes, then walked outside carrying something in his hands. Before he got into the Bronco and drove off, the driver handed the object he had been carrying to one of two people who had walked outside with him. The Bronco then left the residence but returned within a minute or so. The driver stepped outside, was met by one of the two people who had been standing outside with him earlier, retrieved the object he had been carrying earlier, and drove off again, this time without the headlights on.

Officer Green did not follow the Bronco when it left because at the time he was more interested in another vehicle that was parked at the residence. Nevertheless, he radioed other officers on duty to look out for traffic violations committed by the Bronco.

Approximately one-half mile from the residence, Officer Tiner pulled over the Bronco for failing to maintain its lane. Bradford, who was driving the Bronco, said he had dropped his phone, which explained why he had swerved out of his lane. For roughly the first three minutes and thirty-four seconds of the stop, Officer Tiner spoke with Bradford about his traffic violation, Bradford's parole status, and the Bronco. Bradford informed Officer Tiner that he was on parole for attempted robbery, grand theft, and a firearms offense.

Roughly three minutes and forty-five seconds after pulling over Bradford, Officer Tiner returned to his patrol car, communicated with dispatch, pulled out Bradford's driver's license, and began writing the citation. Before he returned to his patrol car, however, two other officers, Michelle Havens and Jessica Perkins, arrived on the scene. Officer Havens positioned herself at the passenger window of the Bronco before Officer Tiner returned to his patrol car to write the citation.

A fourth officer, Jason Green, arrived with his drug dog while Officer Tiner was in his car filling out the citation. Officer Green walked up to Officer Tiner, and the two officers had a brief conversation. The first 26 seconds of the conversation were recorded, and this is what the officers said:

| | |
|---|---|
| Officer Green: | Did you use the lights? |
| Officer Tiner: | Yeah. |
| Officer Green: | What's that? |
| Officer Tiner: | Uhm, (inaudible) fail to maintain lane. When he was coming down, he hit center, uh, lanes and then all the way over into the solid white. I walked up and he was like, "I'm sorry, I dropped my phone. I was trying to get my phone off my feet." |
| Officer Green: | Did you uh, uh, did you tell him about [inaudible]? |
| Officer Tiner: | No. |
| Officer Green: | Okay, I was just thinking, if we don't use that, we might |

*Def. Exhibit B*, Dkt. 17-3, at 05:41 – 06:07.

The recording stops there, midsentence. Officer Tiner explained that he turned off

the camera because the investigation into the "narcotics house" was ongoing and he did not want this part of this conversation with Officer Green to be discoverable. He also testified that majority of his conversation with Officer Green was captured on the body camera. Both officers testified that they did not want to use the Bronco's failure to use headlights as the justification for the traffic stop because they wanted to keep that investigation private. So when Officer Green said, "Did you use lights?" he was referring to Bradford's earlier driving without headlights. Officers Green and Tiner both testified that the conversation was nearly over when Officer Tiner stopped recording the conversation. They further testified that it is standard procedure – at least between the two of them – to stop recording when they want to protect the integrity of an investigation.

After the two officers finished speaking, Officer Tiner remained in his car and continued filling out the citation. Meanwhile, Officer Green went to the Bronco, asked Bradford to step out of the vehicle, and patted him down for weapons. Officer Green testified that he patted down Bradford because he was about to conduct the dog sniff – not because of the traffic stop. When he patted down Bradford, he discovered a handgun in Bradford's jacket pocket.

### III
### THE GOVERNING LEGAL STANDARDS

When a defendant contends that the government obtained evidence in violation of the Constitution, the government, as the proponent of the evidence, must prove its admissibility by a preponderance standard. *See Colorado v. Connelly*, 479 U.S. 157, 168

(1986); *United States v. Hawkins*, 249 F.3d 867, 872 (9th Cir. 2001).  Bradford asserts that that law enforcement officers unlawfully prolonged a traffic stop and unlawfully patted him down for weapons.[1]  The following principles of Fourth Amendment law are relevant to these challenges.

*First,* and most generally, the Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."  U.S. Const. amend. IV.

*Second,* a police officer who observes a traffic violation has probable cause to stop the vehicle and its driver.  *Whren v. United States*, 517 U.S. 806, 810 (1996).

*Third,* during a lawful traffic stop, the officer may conduct unrelated checks – such as allowing a drug dog to walk around the stopped car – so long as the officer does so in a way that does not prolong the stop.  *See Illinois v. Caballes*, 543 U.S. 405, 408 (2005).

*Fourth*, "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission' – to address the traffic violation that warranted the stop . . . and attend to related safety concerns . . . .  Authority for the seizure thus ends when tasks tied to the traffic infraction are – or reasonably should have been – completed.  *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015) (internal citations omitted).

---

[1] Bradford also asserted that law enforcement officers violated his Fifth Amendment rights by conducting a custodial interrogation without first issuing *Miranda* warnings, but the government does not intend to offer Bradford's statements during its case in chief.  Accordingly, the Court will not resolve this dispute.

*Fifth,* an officer may prolong a traffic stop if doing so is supported by independent reasonable suspicion to detain the individual. *Id.*

*Sixth*, during a traffic stop, a police officer may not conduct a patdown search of an individual unless the officer "harbor[s] reasonable suspicion that the person subjected to the frisk is armed and dangerous." *Arizona v. Johnson*, 555 U.S. 323, 327 (2009). This reasonable-suspicion requirement for conducting a patdown search during a traffic stop is the same reasonable-suspicion requirement that applies to patdown searches of pedestrians under *Terry v. Ohio*, 392 U.S. 1, 30 (1968). *See id.*

*Seventh,* "[r]easonable suspicion requires 'specific, articulable facts' which, together with 'objective and reasonable' inferences, form a basis for suspecting that a particular person is engaged in criminal conduct." *United States v. Thomas,* 211 F.3d 1186, 1189 (9th Cir. 2000) (citing *United States v. Hernandez–Alvarado*, 891 F.2d 1414, 1416 (9th Cir. 1989)).

# IV
# ANALYSIS

**A.     The Stop**

The government offers two responses to Bradford's argument that traffic stop was unlawfully prolonged. First, the government says the traffic stop was not prolonged because Officer Green discovered the gun well before Officer Tiner would have completed issuing a traffic citation to Bradford. Thus, the government concludes that notwithstanding the Supreme Court's recent decision in *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015), the traffic stop was not unlawfully prolonged. Second, the

government argues in the alternative that regardless of the conversation between Officers Green and Tiner, they nevertheless had independent reasonable suspicion to prolong the traffic stop based on their earlier surveillance.

The government's first response raises a difficult issue, which the Court and parties have wrestled with at some length. The Court need not resolve it, however, because the government's second, alternative argument is persuasive. That is, based on the surveillance conducted during the early morning hours of January 26, 2017, the officers reasonably suspected that criminal activity was afoot and were therefore justified in prolonging the traffic stop.

The facts supporting the officer's suspicions are outlined above, but to recap, Bradford had visited a residence suspected of narcotics activity at an unusual hour – around 4:00 a.m. He stayed at the residence for less than an hour and before he left he undertook what the officers perceived to be counter-surveillance moves: He left the first time without taking the object he had just had in his hands; he returned within a minute, collected the object, and then drove off again, this time without his headlights on. Based on his training and experience, Officer Tiner thought Bradford might be performing a "heat check," – meaning that Bradford was attempting to see if he would be pulled over before he left with the object. Officer Green thought that Bradford was attempting to leave without being seen by officers who were potentially surveilling the area in patrol cars when he left without his headlights on. Further, when Officer Tiner stopped the Bronco, he learned that Bradford had three convictions (for robbery, grand theft, and a

firearms offense), and had just recently been released from incarceration, and was subject to "the highest level of supervision."

These facts form the requisite "particularized and objective basis" for suspecting that Bradford was involved in a narcotics transaction, which, in turn, justified any delay associated with conducting the dog sniff.  *See United States v. Thomas*, 211 F.3d 1186, 1189 (9th Cir. 2000).  The Court will therefore deny the suppression motion to the extent it relies upon an argument that law enforcement officers unlawfully prolonged the traffic stop.

**B.**     **The Frisk**

The next question is whether Office Green had reasonable suspicion to justify a frisk, or patdown.  An officer who reasonably suspects that an individual is armed and dangerous may perform "a limited search of outer clothing for weapons" to protect the safety of both the officer and the public if the initial stop "is justified by suspicion . . . that criminal activity is afoot." *Arizona v. Johnson*, 555 U.S. at 330.  To justify the officer in proceeding from a stop to a frisk, he or she must have reason to believe that the person detained is armed and dangerous. *Id*. at 323. The purpose of this limited search "is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence . . . ." *United States v. Adams*, 407 U.S. 143, 146 (1972).  For this reason, the officer "need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry v. Ohio*, 392 U.S. 1, 27 (1968).

Here, the Court concludes that a reasonably prudent officer in Officer Green's shoes would not reasonably suspect that Bradford was armed and dangerous before the patdown was conducted.

The government points to several factors supporting a reasonable-suspicion finding, including: (1) the possibility that Bradford may have been involved in drug trafficking; (2) the general notion that if drugs are present, guns will follow; (3) Bradford's admission that he was carrying a knife; and (4) Officer Tiner's knowledge that Bradford had a criminal history including firearm possession. *See Gvt. Supp. Br.*, Dkt. 34, at 9.

The Court is not persuaded that these facts give rise to the requisite reasonable-suspicion finding. First, after hearing the evidence, the Court is not convinced that Bradford acted nervously under questioning.[2] Nor is the Court convinced that Bradford's possession of a knife – which he admitted to having – somehow created a fear that Bradford might be carrying something more dangerous than a pocket knife.

As for Bradford's criminal history, although Officer Tiner had learned that Bradford had previous convictions for robbery, grand theft, and a firearm offense, he did not find it necessary to immediately conduct a patdown search to ensure his safety or the safety of other officers. Instead, he waited for Officer Green to arrive. Officer Green

---

[2] The Court finds Officer Green's testimony credible in all other respects, but is not persuaded by Officer Green's testimony that Bradford acted nervously.

testified that he did not recall Officer Tiner sharing Bradford's parole status with him. And although the government is apparently relying on the collective knowledge doctrine to impute Officer Tiner's knowledge to Officer Green, it does not cite any cases supporting application of that doctrine here. *See id.* (arguing, "In the present case, the collective knowledge of the officers provided reasonable suspicion to conduct the pat down search.").

Thus, the key fact supporting Officer Green's suspicion that Bradford might be armed and dangerous is based on the inference that Bradford may have been involved in a drug deal just before he was stopped. The Court is not convinced that this evidence, even when viewed in the larger context of the traffic stop, is sufficient to cause an officer to reasonably suspect that a person might be armed and dangerous. Granted, many crimes, in and of themselves, might give rise to the right to frisk, but other crimes, such as trafficking small quantities of narcotics or possessing narcotics, typically require the presence of "other circumstance" to justify such a finding. *See generally* 4 Wayne R. LaFave, *Search & Seizure: A Treatise on the Fourth Amendment* § 9.6(a) (5th ed.) (observing that while some crimes, in and of themselves, give rise to the right to frisk, "for other types of crimes, such as trafficking in small quantities of narcotics . . . , there must be, as Justice Harlan noted in *Terry,* 'other circumstances' present.") (citing numerous cases; footnote citations omitted). Here, the fact that Bradford may have participated in a drug deal, standing alone, is not sufficient to carry the government's burden of establishing that the officers had reasonable suspicion that Bradford was armed

and dangerous when the patdown began.

**C.     The Inevitable Discovery**

The Court nevertheless intends to deny the motion to suppress, however, because the officers inevitably would have discovered the gun Bradford was carrying in his pocket. *See generally Nix v. Williams,* 457 U.S. 431 (1984).

"The inevitable discovery doctrine is an exception to the exclusionary rule." *United States v. Andrade*, 784 F.2d 1431, 1433 (9th Cir. 1986). It permits the government to rely on evidence that ultimately would have been discovered absent a constitutional violation. *Nix*, 467 U.S. at 443. The purpose of the doctrine "is to block setting aside convictions that would have been obtained without police misconduct." *Id.* As the Court explained, "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means[,] ... then the deterrence rationale [for the exclusionary rule] has so little basis that the evidence should be received." *United States v. Ruckes*, 586 F.3d 713, 718 (9th Cir. 2009) (quoting *Nix*, 467 U.S. at 444) (footnote omitted; alterations supplied by *Ruckes*).

Here, the Court must ask whether the firearm Bradford was carrying in his pocket would have been uncovered by the officers through permissible means. The government has met its burden on this ground.

Officer Green arrived on the scene that evening for the purpose of conducting an open air sniff, and his dog was certified to detect odors of marijuana, methamphetamine,

cocaine, and heroin. *See Def. Ex. G.* And, as the government correctly points out, a drug dog's positive alert on a vehicle provides probable cause to search the vehicle so long as the dog's reliability has been established. *See United States v. Lingenfelter*, 997 F.2d 632, 639 (9th Cir. 1993).

Officer Green testified that after Bradford was patted down, he conducted the open air sniff and his dog alerted to the presence of drugs. Officers then searched the Bronco and found drugs inside. Given those facts, the officers would have then arrested Bradford and found the gun when they patted him down incident to the arrest. Accordingly, the Court intends to deny the suppression motion. Nevertheless, the Court will refrain from ruling on the motion at this point because defendant has asked for an opportunity to conduct some limited additional questioning regarding the dog's certification and the alert.

In his post-hearing briefing, Bradford pointed out that the Court raised the inevitable-discovery doctrine, sua sponte, at the conclusion of the evidentiary hearing. Defense counsel explained that "[b]ecause neither party briefed this issue prior to the hearing, and because the government bears the burden of proof to establish its application, Mr. Bradford had no notice or incentive to examine the government's witnesses with the issue in mind." *Def. Supp. Br.*, Dkt. 33, at 8 n.4. Defendant also questions whether the dog actually alerted to the presence of narcotics, pointing out that "despite the presence of at least *three* functional video recording devices (i.e., the body cams of Officers Tiner, Havens, and Perkins), Officer Green's audio recorder, and any

patrol dash cameras, the purported vehicle was not recorded." *Id.*

The Court believes there is evidence supporting the dog's alert and certification. Nevertheless, given that this issue was raised late in the day, the Court will reopen the evidentiary hearing for the limited purpose described above.

## ORDER

**IT IS ORDERED that**

**(1)** The evidentiary hearing on the suppression motion shall be reopened for the limited purpose described above. The date and time of this hearing will be set in a separate order.

**(2)** The Court will REFRAIN FROM RULING on Defendant's Motion to Suppress (Dkt. 17) until the reopened evidentiary hearing is concluded.

DATED: November 14, 2017

B. Lynn Winmill
Chief Judge
United States District Court