UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JASON BRADFORD,<br><br>Defendant. | Case No. 1:17-cr-00067-BLW<br><br>MEMORANDUM DECISION AND ORDER |

# I
# INTRODUCTION

The Court has before it a motion to suppress. The Court heard evidence on September 28 and December 14, 2017, and the parties submitted supplemental briefing after each hearing. For the reasons explained below, the Court will deny the motion.

# II
# FACTUAL BACKGROUND

In the early morning hours of January 26, 2017, several Boise Police Department officers, including Officers Mitch Tiner and Jason Green, were surveilling a suspected drug-trafficking residence in Boise. At around 4:00 a.m., Officer Green saw a Ford Bronco pull up to the house and park on the street. The driver, later identified as Defendant Jason Bradford, went inside for between 15 and 40 minutes, then walked

outside carrying something in his hands.  Before Bradford got into the Bronco and drove off, he handed the object he had just been carrying to one of two people who had walked outside with him.  The Bronco then left the residence but returned within a minute or so.  Bradford stepped outside the car and was met by one of the two people who had been standing outside with him earlier.  He retrieved the object he had been carrying earlier, and drove off again, this time without his headlights on.

Officer Green did not follow the Bronco when it left because he was more interested in another vehicle that was parked at the residence.  Nevertheless, he radioed other officers on duty to look out for traffic violations committed by the Bronco.

Approximately one-half mile from the residence, Officer Tiner pulled over the Bronco for failing to maintain its lane.  Bradford told Officer Tiner he had dropped his phone, which explained why he swerved out of his lane.  For the first three minutes and thirty-four seconds of the stop, Officer Tiner spoke with Bradford about this traffic violation, Bradford's parole status, and the Bronco.  *See Ex. B., Tiner Bodycam Video,* Dkt. 17-3, at 0:01–3:34. Bradford informed Officer Tiner that he was on parole for attempted robbery, grand theft, and a firearms offense.

Roughly three minutes and forty-five seconds after pulling over Bradford, Officer Tiner returned to his patrol car, communicated with dispatch, pulled out Bradford's driver's license, and began writing a citation.  Before he returned to his patrol car, two other officers, Michelle Havens and Jessica Perkins, arrived on the scene.  Officer Havens positioned herself at the passenger window of the Bronco before Officer Tiner returned to his patrol car to write the citation.

A fourth officer, Jason Green, arrived with his drug dog, Jackson, while Officer Tiner was in his car filling out the citation. Officer Green arrived to conduct a dog sniff of Bradford's car. Before he did that, however, he walked up to Officer Tiner, and the two had a brief conversation. The first 26 seconds of the conversation were recorded, and this is what the officers said:

| | |
|---|---|
| Officer Green: | Did you use the lights? |
| Officer Tiner: | Yeah. |
| Officer Green: | What's that? |
| Officer Tiner: | Uhm, (inaudible) fail to maintain lane. When he was coming down, he hit center, uh, lanes and then all the way over into the solid white. I walked up and he was like, "I'm sorry, I dropped my phone. I was trying to get my phone off my feet." |
| Officer Green: | Did you uh, uh, did you tell him about lights? |
| Officer Tiner: | No. |
| Officer Green: | Okay, I was just thinking, if we don't use that, we might . . . |

*Id.*, Dkt. 17-3, at 5:41 – 6:07.

The recording stops there, midsentence. Officer Tiner explained that he turned off the camera because the investigation into the "narcotics house" was ongoing and he did not want this part of this conversation with Officer Green to be discoverable. He also testified that majority of his conversation with Officer Green was captured on the body camera. Both officers testified that they did not want to use the Bronco's failure to use headlights as the justification for the traffic stop because they wanted to keep that investigation private. So when Officer Green said, "Did you use lights?" he was

referring to Bradford's earlier driving without headlights.  Officers Green and Tiner both testified that the conversation was nearly over when Officer Tiner stopped recording the conversation.  They further testified that it is standard procedure – at least between the two of them – to stop recording when they want to protect the integrity of an investigation.  Bradford calculates that approximately 73 seconds elapsed between when Officer Green first contacted Tiner and when Officer Green first contacted Bradford.  *See Def. Second Supp. Br.*, Dkt. 43, at 6 n.2.  This comports with Officer Tiner's recollection that "the conversation with Green lasted right around a minute." *Sept. Transcript*, Dkt. 38, at 26:2-3.

After the two officers finished speaking, Officer Tiner remained in his car and continued filling out the citation.  Meanwhile, Officer Green went to the Bronco, but he did not immediately conduct the dog sniff.  (Jackson was still in Officer Green's car at that point).  Instead, he asked Bradford to step out of the vehicle and then he patted Bradford down for weapons.  During the patdown, Officer Green discovered a handgun in Bradford's jacket pocket.  Officer Green questioned Bradford about the gun, arrested him, gave him *Miranda* warnings, and then asked more questions about the gun.

As he was handcuffing Bradford, Officer Green asked Bradford if he could search the Bronco.  Bradford said he didn't care, *see Officer Green audio*, *Ex. H*, at 2:08 to 2:30, and when officers later searched the car, they discovered pipes used for smoking methamphetamine, what they believed to be mushrooms, a white crystalline substance that resembled methamphetamine, scales, suspected marijuana oil, and mushrooms.  *Officer Green Report, Ex. G,* Dkt. 17-8.  Before searching the car, Officer Green ran

Jackson around the car, and the dog alerted. Around five minutes elapsed between the time Officer Green frisked Bradford and the time Jackson gave his final response. *See Dec. 14, 2017 Transcript*, Dkt. 45, at 102:6 to 103:5; *Nov. 22, 2017 Transcript,* Dkt. 38, at 162:4-15; *Haven Video*, Dkt. 17-7; *Green audio*, Dkt. 17-9.

## III
## PROCEDURAL BACKROUND

As noted, the Court conducted two evidentiary hearings. After the first hearing, the Court issued a written memorandum, indicating that although it intended to deny the motion, it would refrain from ruling to allow defendant ask additional questions. *See Nov. 14, 2017 Mem.*, Dkt. 36. Specifically, after the conclusion of the first hearing, the defendant asked the Court to reopen the hearing for the limited purpose of asking more questions about the dog sniff. The government said that it would like to expand the scope of the reopened hearing to explore whether Bradford had consented to the search of his vehicle. And at the beginning of the reopened hearing, yet another new issue cropped up: Bradford argued that the officers unlawfully prolonged the traffic stop even accounting for his allegedly suspicious behavior at the narcotics house.

## IV
## ANALYSIS

A.  **The Drug Dog**

The initial justification for reopening the evidentiary hearing was to allow defense counsel to ask further questions about whether Officer Green's drug dog, Jackson, was

properly certified and whether he alerted[1] to the presence of drugs in the Bronco. After hearing additional evidence, Bradford concedes that Jackson was adequately certified and that the dog's "final response" provided probable cause to search his vehicle. *See Def. Second Supp. Br.*, Dkt. 43, at 2.

**B.     Consent**

The next issue relates to government's contention that Bradford voluntarily consented to the search of his vehicle. This argument is based on the following conversation, which took place as Officer Green was handcuffing Bradford:

Green:      Anything in the truck I need to know about?

Bradford:   [Inaudible]

Green:      Huh? Mind if I search it?

Bradford:   Yeah I don't care.

Green:      Say again?

Bradford:   Yeah, I don't care.

Green:      You don't care?

Bradford:   No.

---

[1] The Court uses the term "alert" as shorthand in this opinion. Note, however, that the dog's behavior is more complex. At the reopened hearing, Officer Green explained the difference between a drug dog's "alert," "indication" and "final response." *See Dec. 14, 2017 Transcript,* Dkt. 45, at 27-30, 60-62. An alert refers to "an innate behavioral change," such as changes in breathing patterns and how the dog holds himself (rigid or loose). *Id.* at 27:11. A dog will alert when he smells drugs (or whatever substances it has been trained to detect). When a dog indicates, it has already alerted and is now trying to find the source of the scent. *Id.* at 36:2-5. The final response is a trained behavior; for Jackson it is sitting down. *Id.* at 64.

>    Green:    All right.

*Officer Green audio recording*, *Ex. H*, Dkt. 17-9, at 2:08 to 2:30.

The government bears the burden of proving that Bradford's consent was voluntary. *United States v. Brown*, 563 F.3d 410 (9th Cir. 2009). Whether consent to search was voluntarily given is "to be determined from the totality of all the circumstances." *Id.* The Ninth Circuit considers five factors, none of which is individually dispositive, in determining voluntariness: (1) whether the consenting individual was in custody; (2) whether the arresting officers had their guns drawn; (3) whether Miranda warnings were given; (4) whether the consenting individual was notified that she had a right not to consent; and (5) whether the consenting individual had been told a search warrant could be obtained. *United States v. Washington*, 490 F.3d 775 (9th Cir. 2007).

Two factors – the second and fifth – favor the government: the officers did not have their guns drawn nor did they try to mislead Bradford by suggesting that they could obtain a search warrant if he did not consent. Additionally, the officers' tone throughout the encounter was not aggressive, and the Court is not persuaded that the language Officer Green used – "mind if I search it?" – was meant to convey information rather than to ask a question.

The remaining factors favor Bradford. He was in handcuffs when Officer Green asked if he could search; he had not been Mirandized, and he had not been informed he could refuse to consent. Additionally, even though the officers did not have their guns drawn, there was a heavy police presence on the scene – four officers and a drug dog.

Further, the hour was late and the fact that Bradford had been seized is an especially weighty factor. *See Washington*, 490 F.3d at 776 ("The district court clearly erred in finding that Washington was not seized, and this factor in context deserves significant weight in our assessment of voluntariness.").

Under these facts, the Court finds that the government has not carried its burden of showing that Bradford voluntarily consented to the search. Nonetheless, for the reasons explained in the Court's previous order (and summarized below), the officers reasonably suspected that Bradford had just committed a narcotics violation and were thus justified in conducting a dog sniff. *See Nov. 14, 2017 Order,* Dkt. 36, at 7-8. And once the dog alerted, the officers had probable cause to search the car. *See United States v. Lingenfelter*, 997 F.2d 632, 639 (9th Cir. 1993). Thus, Bradford's lack of consent is ultimately irrelevant.

C.  **Duration of the Stop**

The final issue relates to the duration of the stop. When Bradford first moved to suppress, he did not know about the surveillance of the suspected narcotics house and therefore did not know the officers were aware of his suspicious behavior there. So he made a straightforward argument based on the Supreme Court's decision in *Rodriguez v. United States*, 135 S. Ct. 1609 (2015). He said Officers Green and Tiner's brief, pre-dog-sniff discussion prolonged the traffic stop because it took Officer Tiner's attention away from the task at hand – issuing a citation. The Court determined that it did not need to resolve this narrow issue because the officers had independent reasonable suspicion to prolong the traffic stop based on Bradford's behavior at the narcotics house. *See Nov. 14,*

*2017 Mem.*, Dkt. 36, at 7.  In other words, this was a narcotics investigation right from the beginning; it was not a garden-variety traffic stop.

Given that this was a narcotics investigation all along, the Court remains unpersuaded that Officer Green and Tiner's pre-dog sniff discussion unlawfully prolonged the stop.  Although Bradford argues that the officers were not trying to figure out if he had committed a drug crime during that one-minute conversation, he overlooks the larger fact that Officer Green showed up for the very purpose of finding out if there were drugs in Bradford's vehicle.  The fact that the two officers had a one-minute discussion before Officer Green approached Bradford does not convince the Court that the officers were not diligently pursuing the drug investigation, or that they had somehow veered off course.  After all, Bradford had engaged in the suspicious behavior right in the middle of the officers' surveillance operation at the suspected narcotics house.  It does not show a lack of diligence if, before conducting the drug sniff, the officers on the scene briefly discussed whether their cover had been blown (*i.e.,* "Did you use the lights?") and then discussed how to keep that surveillance operation secret.  More to the point, this discussion did not add time to the *Terry* investigation; it was part of it.

Granted, the one-minute discussion might create problems for the government if this were a pure traffic stop with a dog sniff opportunistically piggybacking onto that stop. In that setting, the Supreme Court's holding in *Rodriguez* rejects the notion that *de minimis* extensions of a traffic stop are acceptable.  *See, e.g., State v. Linze,* 389 P.3d 150, 153 (Idaho 2016) (*Rodriguez* announced a "broad and inflexible" rule that applies to "all extensions of traffic stops including those that could reasonably be considered *de*

**MEMORANDUM DECISION AND ORDER - 9**

*minimis*"). But, as already explained, this is not a pure traffic-stop/dog-sniff case, and the Court is satisfied that the officers conducted the drug investigation diligently in keeping with the Supreme Court's guidance in cases such as *United States v. Sharpe*, 470 U.S. 675, 686 (1985) (in determining the reasonable duration of a stop, it is appropriate to examine whether the police diligently pursued the investigation) and *Florida v. Royer*, 60 U.S. 491, 500 (1983) ("the investigative methods should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time").

**D.     The Inevitable Discovery**

Bradford next argues that the frisk – which this Court previously found to be unlawful – also prolonged the stop, regardless of whether the stop is viewed purely as a traffic stop, or whether it is viewed as a *Terry* stop to investigate a suspected narcotics violation. But even accepting Bradford's argument, the Court has already determined that the officers inevitably would have discovered the gun. *See No. 14, 2017 Mem.*, Dkt. 36, at 11-12. That is, Officer Green conducted the dog sniff, the dog alerted, and then the officers searched the Bronco and found the drugs. At that point, Bradford would have been arrested. He would have been patted down incident to the arrest, and the officers would have found the gun. The gun is therefore admissible under the inevitable-discovery doctrine. *See generally Nix v. Williams*, 457 U.S. 431 (1984).

The Court discussed this doctrine in its previous memorandum and will not recap the discussion here other than to add that many courts have relied on the inevitable-discovery doctrine in denying suppression motions brought under similar or related

facts.[2] Notwithstanding Bradford's arguments to the contrary, the Court remains convinced that the gun found in Bradford's pocket inevitably would have been discovered. The Court will therefore deny the suppression motion.

# ORDER

**IT IS ORDERED that** Defendant's Motion to Suppress (Dkt. 17) is **DENIED**.

DATED: February 28, 2018

B. Lynn Winmill
Chief U.S. District Court Judge

---

[2] *See e.g., United States v. Garcia,* 496 F.3d 495 (6th Cir. 2007) (officers exceeded frisk power during a *Terry* stop but the evidence discovered on the defendant's person inevitably would have been discovered when defendant was subsequently arrested and searched incident to that arrest); *United States v. Lillard*, No. 8:17CR193, 2018 WL 417595, at *2-4 (D. Neb. Jan. 16, 2018) (although the officers violated defendant's Fourth Amendment rights by searching his vehicle during a traffic stop, the deputies were pursuing a substantial, alternative investigation into a potential DUI; thus there was a reasonable probability that the officers would have found the evidence anyway); *Hatcher v. State*, 834 So.2d 314, 317-18 (Ct. App. Fla. 2003) (despite defendant's claim that he was unlawfully frisked during a traffic stop, evidence obtained admissible under the inevitable discovery doctrine); *see also United States v. Ruckes*, 586 F.3d 713 (9th Cir. 2009) (where vehicle search was invalid, evidence was admissible under inevitable discovery doctrine given standard procedure to impound and inventory the vehicle); *see generally* 6 Wayne LaFave, *Search & Seizure: A Treatise on the Fourth Amendment* §11.4(a), n.78 (5th ed. 2012 & 2017-18 Supp.) (citing numerous cases).